**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| J.P., individually and on behalf of all others similarly situated,<br><br>                               Plaintiff,<br><br>      v.<br><br>MARTIAN SALES, INC. (d/b/a CHOICE ORGANICS); PEYTON SHEA PALAIO (a/k/a PAYTON PALAIO or PEYTON PALAIA); JOPEN LLC (d/b/a A1 WHOLESALE, PARTY NUTS, EVOLUTIONARY ORGANICS, INNOVO ACTIVAS, AMERICAN KRATOM-D); LGI HOLDINGS, LLC (d/b/a ALPHABET WHOLESALE); LP IND., LLC (d/b/a OLISTICA LIFE SCIENCES GROUP, CENTRALIZED SERVICES, JORDAN PROCESS, CASCADE NATURALS, DELLA TERRA PHARMACEUTICALS, NATUREA BIOMATERIALS [a/k/a CANNOPY CORPORATION]); CAG HOLDINGS CO, LLC (d/b/a COMPANION AG); CALIBRE MANUFACTURING, LLC (f/k/a ADVANCED NUTRITION, LLC); NUZA, LLC (a/k/a NUZA LOGISTICS, f/k/a ADVANCED NUTRITION, LLC); JOHN DOE CORPORATIONS 1-10; and OTHER JOHN DOE ENTITIES 1-10,<br><br>                               Defendants. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

       Plaintiff J.P. ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendants **Martian Sales, Inc**., (d/b/a O.P.M.S, Choice Organics); **Peyton Shea Palaio** (a/k/a Payton Palaio or Peyton Palaia); **Jopen LLC** (d/b/a A1 Wholesale, Party Nuts, Evolutionary Organics, Innovo Activas, American Kratom-D); **LGI Holdings, LLC** (d/b/a Alphabet Wholesale); **LP Ind., LLC** (d/b/a Olistica Life Sciences Group, Centralized Services,

Jordan Process, Cascade Naturals, Della Terra Pharmaceuticals, Naturea Biomaterials [a/k/a Cannopy Corporation]); **CAG Holdings CO, LLC** (d/b/a Companion Ag); **Calibre Manufacturing, LLC** (f/k/a Advanced Nutrition, LLC); **Nuza, LLC** (a/k/a Nuza Logistics, f/k/a Advanced Nutrition, LLC); John Doe Corporations 1-10; and Other John Doe Entities 1-10 (collectively, "Defendants"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a civil class action lawsuit against Defendants for their false, misleading, deceptive, and negligent sales practices regarding their OPMS-brand kratom powder, capsule, and liquid extract products (the "Products"). Kratom is a dried leaf that is sold as a loose powder, packaged into gel caps, or made into an extract. However, what reasonable consumers do not know, and Defendants fail to disclose, is that the "active ingredients" in kratom are similar to opioids. That is, kratom works on the exact same opioid receptors in the human brain as morphine and its analogs, has similar effects as such and, critically, has the same risk of physical addiction and dependency, with similar withdrawal symptoms. When reasonable consumers think of opiates and opioids, they think of heroin, fentanyl, hydrocodone, oxycodone, and morphine; they do not expect that the "all natural" product bought at their local corner store operates like an opioid, with similar addiction and dependency risks. Kratom is perniciously addictive – on a whole different level than caffeine or nicotine – and it has sunk its hooks into tens of thousands of unsuspecting consumers and caused them serious physical, psychological, and financial harm. Here, Defendants intentionally and negligently failed to disclose these material facts anywhere on the Products' labeling, packaging, or marketing materials, and have therefore violated warranty law and state consumer protection laws in the process.

2.      Extensive investigative reporting by the Tampa Bay Times, and upon the research of counsel, has revealed that Defendants are all part of a singular enterprise responsible for various aspects of growing, importing, designing, manufacturing, testing, processing, labeling, packaging, shipping, marketing, and selling their kratom Products under the "OPMS" brand name across the United States (the "OPMS Kratom Enterprise.").[1]  The OPMS Kratom Enterprise is spearheaded by Defendant Peyton Palaio and Mark Reilly, President of Martian Sales, Inc., who have employed a web of shell companies, alter egos, business names, assumed names, and trade names to obfuscate the immense scope of their operation and dodge liability for their actions under the OPMS brand.  Defendants operate collectively: each of them is within the chain of distribution of OPMS products, operates as OPMS, controls, or owns OPMS, and/or is an affiliate of OPMS. Defendants share principals, membership, agents, and addresses.  Thus, Defendants should be considered as part of a collective whole, sister entities operating in furtherance of the OPMS Kratom Enterprise at the behest of Peyton Palaio, Mark Reilly, and other key unknown individuals.

3.      Defendants rely on their Products' innocuous packaging and the public's limited knowledge about kratom and its pharmacology to get users addicted, while reaping profits along the way.  Reasonable consumers do not expect the liquid extract bottles and pouches of kratom powder or capsules, which they can purchase at gas stations and corner stores, to perform like an opioid with the same addictive potential of morphine and its analogs.  Defendants rely on this ignorance and do nothing to correct it.  Such activity is outrageous and is in contravention of New York law and public policy.

---

[1] *See* Hannah Critchfield, Helen Freund and Langston Taylor, *DEADLYDOSE PART 3: Kratom's path across the US is marked by deception and secrets*, TAMPA BAY TIMES (December 17, 2023 htt2s:// project. tampabay. com/ investigations/ deadly- dose/ kratom- industry- opms-supply-chain-indonesia-florida); Hannah Critchfield, *A major US kratom brand relies on a maze of companies. Here' s the list,* TAMPA BAY TIMES ( Dec. 19, 2023) (https://www.tampabay.com/investigations/2023/12/19/major-us-kratom-brand-relies-maze-companies-heres-list/ ).  The reporting is attached hereto as **Exhibit A** and **Exhibit B**.

4.     Defendants' chief officers, Peyton Palaio and Mark Reilly, have a history of prioritizing profits over public health.  They are no strangers to the civil *and* criminal legal systems. The products sold as part of the OPMS Kratom Enterprise, and their previous synthetic cannabis enterprise, have killed multiple people, resulting in wrongful death lawsuits and millions of dollars in settlement payments.

5.     Defendants and their officers have engaged in a systemic effort to peddle an addictive substance to unsuspecting and oftentimes vulnerable consumers.  Plaintiff seeks relief in this action individually, and as a class action on behalf of similarly situated purchasers of Defendants' Products, for: (i) violation of New York's General Business Law (GBL) § 349; (ii) New York's GBL § 350; (iii) breach of implied warranty; (iv) unjust enrichment; (v) fraud by omission; and (vi) negligent misrepresentation.

6.     Because this action concerns issues of addiction and medical status, Plaintiff is filing under his initials for the sake of his personal privacy.  Plaintiff is a reasonable consumer who fell victim to Defendants' omissions and misrepresentations about the addictive nature of kratom, which operates like an opioid, and became addicted as a result.  Since addiction issues are still wrongly stigmatized, Plaintiff is filing this matter anonymously but will reveal his name as necessary to the Court under seal.

## PARTIES

7.     Plaintiff J.P. is a citizen of New York, who resides in Brooklyn, New York and intends to stay there.

8.     Defendant Martian Sales, Inc., is a Wyoming corporation with its principal place of business in Sheridan, Wyoming.  Mark D. Reilly, a longtime associate of Peyton Palaio, is the President of Martian Sales, Inc., which owns the trademark for OPMS.  The Martian Sales' 2021 and 2022 Annual Reports list 2550 Sandy Plains Road, Suite 225 Box 319, Marietta, Georgia

30066 as its principal business location.  The OPMS trademark was registered in an office suite that has been long associated with Palaio and Reilly – 1880 West Oak Parkway, Suite 214, Marietta, GA 30062.[2]

9.    Defendant Peyton Palaio (also known as Peyton Palaia, Payton Palaia, and Payton Palaio) is a citizen and resident of the State of Georgia.  Peyton is the head of the Kratom Enterprise and was the original creator of the OPMS brand in Marietta, Georgia in or around 2012.  Though he may not appear on any official business filings, interviews with employees and kratom distributors "mention Palaio by name as the CEO or head of the [OPMS Kratom Enterprise]."[3]

10.    LGI Holdings, LLC (d/b/a Alphabet Wholesale) ("LGI") is a Wyoming limited liability company located at 30 N Gould St. Ste. 22533, Sheridan, WY 82801 USA.  The 2021 Annual Report lists 2550 Sandy Plains Road, Ste. 225 Box 319, Marietta, GA 30066 as its principal office address.  The 2024 Annual Report lists Conner W. Watts, 245 Peachtree Center Ave., NE, Atlanta, GA 30303 as the organizer of Defendant LGI Holdings, LLC.[4]  However, Peyton Palaio has claimed in signed court filings that he is the true head of LGI Holdings.  Documents filed in a lawsuit against Palaio and LGI show that Peyton Palaio used LGI to enter into a kratom supply deal with Cleanview Distribution Group, a company located in Los Angeles, California.  LGI appears to handle kratom imports for the Kratom Enterprise, with internal documents showing that

---

[2] **Exhibit C**, OPMS Trademark Filing Address.

[3] **Ex. A** at 10.

[4] Conner Watts is an Atlanta-based attorney who appears all over the OPMS Kratom Enterprise's legal filings.  He appears to handle legal filings for real property holding companies for the OPMS Kratom Enterprise.  Each parcel of land or building is assigned its own LLC as a means of hiding the extent of the OPMS operation.  For instance, Conner Watts is listed as the organizer for "Highway 160 Way, LLC" which holds title to the land in Springfield, Colorado where Defendant Jordan Process operates a kratom extract lab.  Conner is also the organizer of "1199 Industrial LLC," which owns a building located at 1199 Atlanta Industrial Drive, Marietta GA, which is where Defendant Calibre Manufacturing processes and encapsulates OPMS kratom.  *See* https://opencorporates.com/officers?utf8=%E2%9C%93&utf8=%E2%9C%93&q=Conner+Watts&jurisdiction_code=&type=officers.

it intended to import around **35 million kilograms of kratom** over a six-year period through the ports of Oakland and Los Angeles. The kratom was ultimately intended for use in the manufacture of OPMS capsules and extracts in Georgia, Colorado, and Texas. Palaio placed orders for raw kratom through LGI to obfuscate that the OPMS Kratom Enterprise was behind it.

11.    LP Ind., LLC (d/b/a Olistica Life Sciences Group, Centralized Services, Jordan Process, Cascade Naturals, Della Terra Pharmaceuticals, Naturea Biomaterials [a/k/a Cannopy Corporation]) ("Olistica" or "Jordan Process") is a Wyoming limited liability company located at 30 N Gould St., STE 20464, Sheridan, WY. Its 2021, 2022, and 2023 Annual Reports listed 2550 Sandy Plains Road, Ste. 225, Box 319, Marietta, GA 30066 as its principal place of business. Until early 2023, Peyton Palaio openly held himself out as the CEO of Olistica.[5] This allegation is substantiated by emails from Peyton which were filed as exhibits in another lawsuit,[6] in which Peyton refers to Olistica as his "operation"[7] which is part of a network of corporations forming the "largest kratom business in the United States."[8] That email from Peyton also included an attachment, a business presentation for Olistica which details that Olistica and the other LP Ind., LLC entities are in charge of kratom farming, kratom research, and OPMS extract production. OPMS extract production is handled specifically by Jordan Process at a facility at 23298 US Highway 160, Springfield, Colorado.[9] Jordan Process is named after Palaio's brother, Samuel Jordan Palaio, who died of a heroin overdose in 2015.[10]

---

[5] *See,* **Exs. A** and **B.**

[6] **Ex. D,** *Cleanview Distribution Group, LLC, v. LGI Holdings LLC, Peyton Palaio, et al.,* No. 2:21-cv-07178-SB-JC, Complaint.

[7] **Ex. E**, Olistica Slide Deck.

[8] **Ex. D,** Cleanview Complaint ¶ 2.

[9] **Ex. E**.

[10] **Exhibit A** at 23.

12.    Jopen, LLC (d/b/a A1 Wholesale, Evolutionary Organics, Innovo Activas, American Kratom-D, and Party Nuts), is a limited liability company formed in Texas and Wyoming.  Jopen operates in all parts of the OPMS Kratom Enterprise.  Jopen places orders for kratom and pays invoices for orders made by other OPMS Defendant entities.  It acts as a manufacturer of OPMS kratom through its operations in Georgia as Innovo Activas and American Kratom-D (which operate or operated in the same office suite in Marietta, Georgia where the trademark for OPMS was registered).  It sells OPMS kratom wholesale through PartyNuts.com (which shares a warehouse with A1 Wholesale).  And it packages, labels, and distributes OPMS kratom through A1 Wholesale at another warehouse located at 4949 Beeman Avenue, Dallas, Texas.  Thus, Jopen and its fictitious entities take part in the OPMS Kratom Enterprise throughout the United States, including in New York.  In secretary of state filings, Jopen declares it operates A1 Wholesale, Party Nuts, and Evolutionary Organics out of the same address: 203 N Prairie Ave, Dallas, TX 75246.[11]

13.    CAG Holdings CO, LLC (d/b/a Companion AG) is a Colorado foreign entity with its principal place of business at 23298 US Highway 160, Springfield, CO 81073.  It operates under the Olistica Life Sciences Group umbrella of Defendant entities.  Internal documents filed as exhibits in the *Cleanview* lawsuit indicate that Companion AG is in charge of cultivating relationships with kratom farmers in South Asia.[12]  It describes itself as "a modern co-op that manages select commercial agricultural crops" that focuses "on medicinal plants, botanicals, and biomaterial feedstock alternatives or sustainable materials feedstocks."  It deals with farmers

---

[11] **Ex. F**, Jopen LLC Secretary of State Filing.

[12] **Ex. E**, Olistica Slide Deck.

which "range in size from one-acre farms to those with more than 10,000 acres in agricultural production."[13]

14.    Calibre Manufacturing, LLC is a Wyoming limited liability company.  Its Articles of Organization in 2021 lists 2550 Sandy Plains Road, Ste. 225, Box 319, Marietta, GA 30066 as its principal place of business.  Calibre operates at 1199 Atlanta Industrial Drive, Marietta, GA, and 9305 Industrial Trace, Alpharetta, GA 30004, where it processes and encapsulates OPMS kratom.  Calibre Manufacturing used to be known as Advanced Nutrition LLC.[14]  Advanced Nutrition LLC used to list 1880 West Oak Parkway, Suite 214, Marietta, GA as its principal place of business, where the OPMS trademark was registered and where Peyton Palaio and Mark Reilly ran one of their prior ventures, a synthetic cannabis operation.  In late 2022 Advanced Nutrition split off into two Defendant entities, Calibre Manufacturing, LLC and Nuza LLC.[15]

15.    Nuza, LLC (d/b/a Nuza Logistics) is a Wyoming corporation with its principal place of business at 30 N Gould St. Ste. 32632 Sheridan, WY 82801.  Nuza is also registered in Georgia where it conducts its operations in Marietta.  Online job postings indicate that Nuza is in charge of shipping OPMS from and to the various production facilities run by Defendants around Marietta and Alpharetta, Georgia.  Nuza LLC, along with Defendant Calibre Manufacturing LLC, used to be known as Advanced Nutrition LLC.

16.    Defendants John Doe Corporations 1 through 10 are corporations, the names and addresses of residences of which are presently unknown.

17.    Defendants John Doe Entities 1 through 10 are other persons or legal entities, the names and addresses of residences of which are presently unknown.

---

[13] *Id.*

[14] **Ex. B**

[15] *Id.*

18.     Defendants should be treated as a single enterprise for purposes of this litigation because they have:

(a)     Commingled their funds and other assets and failed to segregate funds between them;

(b)     Treated each other's assets as their own;

(c)     Failed to maintain minutes and corporate records and confused the records of the other OPMS Defendant entities;

(d)     Used the same business locations and employed the same employees;

(e)     Share a unity of interest and ownership that each of the Defendants acts merely as a shell of the OPMS Kratom Enterprise as a whole; and

(f)     Failed to adequately capitalize themselves such that if only one entity were to be held liable for the actions of the whole it would be unable to compensate Plaintiff and the putative class for their harms and thereby promote injustice, unfairness, and fraud.

19.     Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendants who has knowingly and willfully aided, abetted, and/or conspired in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendants.

21.     This Court has personal jurisdiction over the parties because Plaintiff resides in New York, is a citizen of New York, and submits to the jurisdiction of the Court, and because Defendants have, at all times relevant hereto, systematically and continually conducted, and continue to conduct, business in this State.  Defendants therefore have sufficient minimum contacts with this State, including within this District, and/or intentionally availed themselves of the benefits and privileges of the New York consumer market, and directed their activities thereto,

through their business activities in furtherance of the OPMS Kratom Enterprise within the State, and through the sale of OPMS kratom to distributors and wholesalers within this District and throughout this State.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants regularly do business in this District by directing the sale of their OPMS kratom Products to wholesalers and distributors in this District.  Further, the same misrepresentations, omissions, and injures giving rise to the claims alleged herein have occurred in this District (e.g., the distribution and sale of OPMS kratom to Plaintiff, and Plaintiff's subsequent addiction to kratom).

## FACTUAL ALLEGATIONS

A.     **Background and Pharmacology of Kratom**

23.     Kratom is a drug,[16] which is derived from the kratom plant, *mitragyna speciosa*, indigenous to Southeast Asia, where it has been used in herbal medicine since at least the early 19th century.  Use of the plant has been particularly well-documented in Thailand, Indonesia, and Malaysia, and it remains popular in each of those countries to this day.  Kratom is the most widely used drug in Thailand, for example.

24.     The first reported use of kratom in scientific literature dates back to 1836 when it was noted that the leaves of the tree were used by Malays as a substitute for opium.

25.     The plant's leaves are harvested, dried, and crushed into a fine powder, which is then packaged, either straight into a pouch or in capsules, and sold by manufacturers like O.P.M.S. The drug can also be extracted into a liquid formulation, colloquially called a kratom "shot."

26.     In the West, kratom is sold through the Internet and at herbal stores, gas stations, corner stores, smoke shops, and "head" shops where it is primarily marketed as an herbal medicine

---

[16] Kratom is unregulated by the FDA, so the usage of the word "drug" here is meant in the colloquial sense, rather than as a defined term under the Food, Drug, and Cosmetic Act.

or supplement to treat a variety of ailments (*e.g.*, pain, mental health, opioid withdrawal symptoms), as well as a "legal" or "natural" high by some manufacturers.

27.     The chemicals in the plant which produce a psychoactive effect when ingested are called "alkaloids."

28.     The primary alkaloids in kratom plant leaves responsible for the kratom "high" are *mitragynine*[17] ("MG") and 7-*hydroxymitragynine* ("7-OH").

29.     MG and 7-OH exhibit a wide variety of pharmacological effects, resulting in a highly dose-dependent response.  For example, a low dose (0.5 grams to 3 grams) of kratom is typically described as stimulating or energizing, whereas a high dose (3+ grams) is described as euphoric, sedating, and analgesic.  On the whole, however, kratom's high is not overwhelming like it would be for a "hard" drug like cocaine or heroin – it is somewhat more subtle, but its effects are nonetheless substantially similar to opiate-based painkillers such as hydrocodone and oxycodone in sufficient dosages.

30.     Kratom's variable but not debilitating effects have always been part of its appeal. For instance, the use of kratom in Southeast Asia has been documented back for at least 150 years and the earliest accounts described both a stimulant effect for use in hard day-labor when fresh leaves are chewed, and an analgesic and relaxing effect if brewed into a tea.

31.     MG and 7-OH produce such a wide spectrum of effects because they interact with many different receptors in the brain.  Studies have shown that MG and 7-OH interact with alpha-2 adrenergic receptors (adrenaline), D2 dopamine receptors, and the serotonin receptors 5-HT2A and 5-HT2C, all of which contribute to the drug's mood-lifting and stimulant-like effects.

32.     Most crucially, MG and 7-OH also interact with the mu-opioid receptor.

---

[17] Pronounced "Mitra-Guy-Neen."

33.     The mu-opioid receptor is known as "the gateway to addiction" because it is the receptor which all opiates/opioids interact with to produce the classic opiate high: euphoric, sedating, and analgesic.  This means that MG and 7-OH interact with the primary receptor that heroin and oxycodone interact with.

34.     There are other opioid receptors, but the mu-opioid receptor produces the most "hedonic" or habit-forming effects such as euphoria and analgesia.

35.     Mitragynine and 7-hydroxymitragynine were found to be more potent to the mu-opioid receptor than morphine via oral administration, 7-OH in particular is 17 times more potent than morphine, though the actual effect of kratom is dose-dependent, as discussed above.

36.     Kratom is therefore considered by health professionals to be similar to an "opioid" and a "quasi-opiate."

37.     The notion that kratom is substantially similar to an opioid, and a quasi-opiate, is reaffirmed by the following facts.  First, kratom's effects are very similar to those of other opioids.  Second, when administered, kratom alleviates opioid withdrawal symptoms.  Third, repeated use of kratom in itself results in opioid withdrawal symptoms.

38.     All substances which act on the opioid receptors carry a very high risk of addiction, and kratom is no exception.

39.     Addiction occurs when an opioid is ingested on a regular basis.  Over time, the user develops a tolerance to the drug, requiring increased dosages to get the same effects as a lower dose used to have.  As the dosages go up, the body becomes dependent on some amount of the drug to feel normal.  When the drug is suddenly taken away, the user feels much worse than before they started taking the drug: this is what is known as withdrawal.

40.     Opioids are addictive not just because of the pleasurable effects that they produce, but because sudden cessation of opioid use causes severe withdrawal symptoms which users feel

compelled to avoid by taking more of the drug.  The tragedy of addiction is that users want to stop, but they cannot.

41.     The symptoms of kratom withdrawal are very similar to those of traditional opiate withdrawal.  Such symptoms include: irritability, anxiety, difficulty concentrating, depression, sleep disturbance including restless legs, tearing up, runny nose, muscle and bone pain, muscle spasms, diarrhea, decreased appetite, chills, inability to control temperature, and extreme dysphoria and malaise.

42.     Users typically start substances like kratom because of how good it makes them feel, but once addicted, they use them to avoid the pain of withdrawal.  It no longer is about getting high, but about not feeling "sick."

43.     With kratom in particular, users note that the addiction sneaks up on them, and that it feels as though, over time, the color has been sapped from their lives.  Long term users of kratom have reported experiencing depression, anxiety, anhedonia, and reduced sex drive.

**B.      Kratom Use and Addiction in the United States**

44.     Kratom use in the United States has exploded over the past decade.  As of 2021, the American Kratom Association estimates that kratom is a 1.3 billion dollar a year industry, with 11 million to 15 million annual users in the United States.

45.     Other studies have found that about 1 million people use kratom in the United States every month.  Two-thirds of those users use kratom daily.

46.     Kratom's popularity can be attributed to a number of factors: first, it is often marketed as a safe substitute for painkillers and appeals to those who equate "natural" with "safe;" second, it has received attention from the media as a "nootropic" or "smart" drug because it is stimulating at low doses; third, its popularity has grown simply because it is so widely available,

it produces a pleasurable high, and it is unregulated; finally, users are not aware that it is similar to an opioid with opioid addiction potential.

47.    On the whole, however, kratom is a relatively unknown drug to the average consumer.  Most people in the United States have never heard of it.

48.    The advertisements and commentary about kratom say that it is like a substitute for coffee, a pain reliever, a treatment for opioid withdrawal, an antidepressant, an anti-anxiety supplement, that it improves focus and gives users a boost of energy to get through the day.  These advertisements universally espouse the purported benefits that kratom use can provide, without disclosing that the drug is similar to an opioid with the addictive potential of one.

49.    What's more, because kratom does not produce a debilitating "high" like cocaine or heroin, it is very easy for users to take the drug every day without feeling as though they are developing a drug addiction or harming themselves.  This makes kratom a particularly insidious drug because addiction can sneak up on unsuspecting users and can hold them in its grip despite their best efforts to stop using.  The advertisements and word-of-mouth disclosures do not make this clear to consumers.

50.    Because manufacturers and advertisers of kratom, such as Defendants, do not disclose the addictive potential of this drug, many users have found themselves blindsided when they wake up one morning in the throes of withdrawal after having stopped using what they thought was an innocuous supplement.  They then discover just how painfully dependent they have become on kratom.  Because kratom is relatively unknown in the United States, many did not know where to turn for resources and aid.  Some users came together on the Internet to share their experiences and support each other as they attempt to get off the drug.  There are even well-populated and very active Internet forums serving as support groups for those struggling with and recovering from kratom addiction.

51.     The reports from users who have fallen into addiction, or succeeded in escaping the drug's grasp, are heart-wrenching.  Consistent among these reports is the initial shock that users felt when they realized they had become unwittingly addicted, and just how difficult it was for them to stop.  Below are just a few accounts from the "Quitting Kratom" forum on www.reddit.com, which has 48,000 members as of February 2025, and where the O.P.M.S. brand is particularly reviled:

About 23 months ago, one user wrote: "I've been on a 50gpd [grams per day] habit for about 4 years. Like most people here, **I was in denial that the Kratom was causing my multitude of issues. How could it be the Kratom when everyone keeps telling me how great it is?** I made myself believe that I had underlying issues that the Kratom was helping. Spoiler: It wasn't. **I slowly became a shell of the person I used to be. TRUE clinical depression symptoms with zero joy in my life.** I started browsing this subreddit and reading everyone's stories and I related to every single one. Everyone had the same exact experience I had and at that moment I knew it was the Kratom causing my depression." (emphasis added).

About 4 years ago, a gas station employee wrote in a post titled "OPMS": "I work at a gas station where we sell kratom such as powders, gold and silver pills and especially shots etc (you know which one I'm talking about) **it's just mind blowing to me how many people are practically addicted and how many customers literally scavenge their money to pay for their daily shot**. Why are people so addicted especially to those shots."

About 22 months ago, a user solicited "extract horror stories" in a post titled "Fuck OPMS Shots."  One user responded: "Took 2-3 shots a day for almost 2 years.  How did it screw me up?  Let me count the ways.  Financially it was draining me, 100%! **I would estimate 60% of my hair fell out.  My skin was grey.  My eyes were dark.  I became a hermit.**  No longer wanted to do anything, including self care or hygiene.  Just taking a shower was a chore I had to talk myself into the last few months.  I was disgusting and did not care at all. All I cared about was that I had enough K for tomorrow."

In response to the same "Fuck OPMS Shots" post, another user responded: "I used OPMS black pills and sometimes the shots for over 5 years.  I'm now 290 days clean from them. **They were so hard to kick bc of how addicting they are.**  And you can just walk in the store and buy them.  I was spending $45 day on this stuff.  **I wasted tens of thousands of dollars on it and my life suffered.**  Lots of my hair fell out and it's only now starting to grow back some, I think most of it is gone for good.  I'm repairing my marriage and friendships.  Everything.  Stay away from this stuff."

Another user responded: "Amen.  This shit got hold of me as bad as anything else I've ever done... spent WAY more money on these fucking things than real honest to

God hard drugs back in the day. **Anywhere from 6-10 of these things daily for... years. Let's call it 7 at an average of $18/pop = $126/day x 30 = $3780/month = about $45k/year.** How fucking embarrassing. I made $140,000 last year living in Georgia (pretty low cost of living) and pretty regularly get busted "borrowing" money from my 10 year old son. Fuck this; I'm not living like this anymore."

About 4 years ago, another user wrote: "I saw 'A Leaf of Faith' and got the impression that kratom was a generally friendly substance to use freely, never knowing how addictive it was, how much it was further numbing me beyond how alcohol already was, how it was slowly wiping out my sex drive, and likely contributing to my perpetual brain fog. … My second attempt [at quitting] was maybe another 7 or 8 months later. Kratom was making me pretty miserable. I was reading posts in this subreddit and I was finally aware of how addicted I was; feeling crappy, sluggish, and sorta spacey pretty much all the time."

About 4 years ago, another user wrote: "What a difficult journey it has been. I was a ~75 GPD [grams per day] user. **Quitting kratom was one of the hardest things I've had to do in my life.** I learned the hard way that kratom causes withdrawals on a work trip 3 years ago. I should have stopped then and there but I gave in because the RLS was so bad. … Kratom withdrawal is seriously no joke so don't think you're the only one struggling so much. I'm only a week free but after this experience I know for sure that I will never go back. Good luck everyone!" (emphasis added).

About 4 years ago, another user wrote a post titled *Kratom Is An Addictive Drug*. It said, in part: "It's been 23 hours since my last dose. **I just wanted to give my story hoping that it would help others see that they've been lied to, deceived and manipulated into thinking this plant is 'harmless and safe'.** As a matter of fact, reading the horror stories on this subreddit was the first step in my recovery... I started taking it almost 3 years ago after hearing about it on... well, Reddit. They touted it is a miracle plant that had all the benefits of an opioid with none of the side effects." (emphasis added).

About 3.5 years ago, another user wrote: "**I think the perfect word to describe Kratom addiction is 'insidious'. Here is the definition –** *'proceeding in a gradual, subtle way, but with harmful effects.'* I think this is why it takes so long to realize what is going on. There was never a rock bottom moment for me like there would be for other more conventional abused drugs. No overdose, no bad behavior, no abusiveness to my family, no DWI, etc.. - It was just a lazy, slow descent into nothingness. I was living in a groundhogs day type of existence. Wake up, go to work, leave work, buy an extract shot or 2, have dinner, drink my shot, mindlessly look at my phone and/or watch TV. Wake up and do it all over again." (emphasis in original).

About 3 years ago, another user wrote: "I started using k[ratom] when I had knee surgery Dec 2019 so 3 years. **I didn't want to use pain killers because I got sober from alcohol 3/6/2018 and i felt the pain killers were going to make me relapse.** I didn't know I would end up in a worst place as I am now." (emphasis added).

About 4 years ago, another user wrote: "Was in bed all day yesterday fighting withdrawals. I used to even be an athlete - strong lean and fit, until I got on [kratom] shots and extracts. Didn't even get high any more - just wanted to not feel bad."

About 6 years ago, another user wrote: "I researched kratom before using it and almost every site promoted that its harmless with healthy benefits, and that its withdrawals are like coffee for 3 days max. Information wasn't clear that kratom could become a negative addiction that takes months to recover" … "I took something I thought was helping me for 1.5-2 years, not even knowing the downsides bc that information was so misleading. It fucked up my digestion, energy, mood, brain fog, anxiety, etc. Fuck kratom, and fuck those who peddle it as a harmless cure-all."

About 2 years ago, another user wrote: "For any newcomers: this stuff is absolutely no joke. It's not harmless and the wd [withdrawal] is *definitely* **not** like caffeine. I've cold turkey'd caffeine before and I had a slight headache for a couple hours. I definitely have never woken up in a pool of my own sweat from not having my caffeine. … **This stuff is a drug. A serious drug. And it's super freakin addictive**. Extracts, powder, or in my case, capsules…it doesn't matter. Yes some forms are more addictive than others but the WD is hellacious no matter how you're taking it." (emphasis original).

About 2 years ago, another user wrote: "This stuff is a drug, and dangerous! **I started taking it because of all the good things I heard and read about it**. I've never been addicted to or dependent on anything before, but this stuff has totally taken control of my life." (emphasis added).

About 2.5 years ago, another user wrote: "I finally realized a few weeks ago how much of a negative impact kratom was having on my life. I noticed myself planning my whole day around my doses and making sure when I left the house I'd bring an extra dose with me in a shaker bottle. It was heavily affecting my mood overall, but especially in public settings. I did not want to leave my house most days even if I did dose."

About 2.5 years ago, another user wrote: "**I have been taking OPMS black pills for about a year now. It has ran my bank dry.** When I wake up in the morning I fucking crave this shit. I have never been addicted to opiates or anything like that. I get to the point where I am going to go cold turkey and am so confident but when I wake up my brain makes me think its okay to go get it. I cant talk to anyone about this in my family or friends. I have a very high stress job and am also going through a nasty break up. I feel so alone with trying to stop and when I betray myself and go to get more, i fight back tears in the parking lot (I am a grown ass man). I am not an emotional person and in my environment theres no room for emotions. Should I tapper off? What the fuck do I do?"

About 1.5 years ago, another user wrote of Defendants' product: "**I was taking one to two opms gold shots a day (sometimes three) for about two years straight**. When the 24hr mark hit the withdrawals kicked in hard. I had become absolutely

obsessed with scavenging 20$ togther to make sure I got my shot each day. Constantly driving to the shop, hoping no one would see me pop out. I wanted to quit every night but just couldn't stand the withdrawals. I finally quit (on day 17 ct) with the help of a quit buddy I found in this sub. I'm still not right at all, RLS is there and my sleep is still off. I'm sneezing more than I ever have. But, music is back, I have more money in my pocket and I feel free from the grips. I've still got a long ways to go but am committed to never touching that shit again. It brought out the worst version of me."

52.     This Internet forum is filled with accounts just like these. The stories are consistent – well-meaning people who were looking to feel better, in mind body and spirit, by taking an "herbal supplement," only to end up with an opioid-like addiction.

53.     What is particularly insidious about kratom is that, at the early stages, many users are unaware of its negative side effects and its addictive potential, so when they begin to experience the malaise of addiction, they do not attribute it to the kratom. Rather, they take more of the substance thinking that it is helping them with their malaise.

54.     As these accounts make clear, the addictive potential of kratom is a material fact to reasonable consumers which would help inform their purchase and consumption decisions. Defendants' products have no information whatsoever that kratom is similar to an opioid, is habit-forming, and that regular use will result in opioid-like dependency, with withdrawal symptoms similar to those of traditional opioids.

55.     Consumers who knew the truth about kratom may not have purchased Defendants' Products or would have paid less than they did for them.

## C.     Peyton Palaio, Mark Reilly, and the Beginning of OPMS

56.     OPMS kratom was started in or around 2012 by Defendant Peyton Palaio and Mark Reilly at a small office in Marietta Georgia, located at 1880 West Oak Parkway, Suite 214.[18] Palaio and Reilly are long-term associates and friends.  Indeed, Georgia Department of Motor Vehicles records show that a relative of Peyton's, Samuel R. Palaio, gave Reilly a truck in July 2012.[19] Reilly then transferred ownership of the truck to Defendant Palaio a year later, in June of 2013.[20]

57.     At the time, the two were primarily focused on running a synthetic cannabis operation under the names Omerta Labs, LLC and Lunar Labs, LLC – both located at the same 1880 West Oak Parkway address where the OPMS trademark was registered.[21]  Palaio ran the operation, but Reilly was the registered agent for Lunar Labs at the time.[22]

58.     In 2012, the Georgia Bureau of Investigation (GBI) raided the office at 1880 West Oak Parkway to seize the synthetic cannabis that the two were producing.[23]  The agents had caught onto the duo because "they found an invoice, which listed suspected [synthetic cannabis] products recently shipped from the lab, in a nearby dumpster."[24]  During the raid, Palaio was also found producing one of the early runs of OPMS kratom.  As one GBI officer recalled: "[Palaio] had a lot of kratom there … he was making a product, 'Kratom OPM,' he called it … [t]o me, obviously, it was a nod to opium — to get your attention."[25]

---

[18] **Exhibit C**, OPMS Trademark Registration

[19] **Exhibit G,** DMV Records

[20] *Id.*

[21] **Exhibit H**, DEA Lawsuit ¶ 21.

[22] https://ecorp.sos.ga.gov/BusinessSearch/BusinessInformation?businessId=1671691&business Type=Domestic%20Limited%20Liability%20Company&fromSearch=True

[23] **Exhibit H** ¶ 21.

[24] **Exhibit A** at 7.

[25] *Id.*

59.    The 2012 GBI raid would not be Reilly and Palaio's only run in with law enforcement.  In 2016 US Drug Enforcement Agency (DEA) agents located in Carson, California seized two sophisticated and expensive drug manufacturing machines: a "JTJ-A Semi Automatic Hard Capsule Filling Machine" along with "a SRJ-5 Small Soft Gelatin Capsule Filling Machine."[26]  The machines were bound for "Precision Biologics," located at 1880 West Oak Parkway, Suite 214, Marietta, Georgia.[27]  Research by the agents revealed that Precision Biologics was not a legitimate corporate entity, however.[28]  Further research by the agents showed that Defendant Palaio was associated with the 1880 West Oak Parkway address because he had listed it as the principal place of business for his synthetic cannabis operations: Lunar Labs and Omerta Labs, which he ran with Mark Reilly.[29]  The agents came to suspect that Palaio and Reilly had ordered the machines without prior clearance from the DEA with the intent to manufacture drugs.[30]

60.    The agents' suspicions were confirmed when, in January 2017, Defendant Palaio filed a claim with the DEA "contending that he is the owner of the [] machines" and stating that he was only going to use the machines "for research in the area of process scale-up of liquid single dose products."[31]  Palaio's complaint was judged deficient, and he eventually dropped the claim.

61.    In truth, however, the capsule filling machines the DEA had seized from Reilly and Palaio were not intended for use in the production of synthetic cannabis.  Synthetic cannabis, like the kind Palaio and Reilly manufactured at the 1880 West Parkway Address, is not consumed in pill form – rather, it is smoked.  In reality, Palaio and Reilly had purchased the machines for use

---

[26] **Ex. H** ¶ 1.

[27] *Id.* ¶ 12.

[28] *Id.* ¶ 41.

[29] *Id.*

[30] *Id.* ¶ 21.

[31] *Id.* ¶¶ 51-51.

in the production of OPMS kratom.  The "liquid single dose products" Palaio claimed he was intending to use the machines to produce were not synthetic cannabis – they were OPMS kratom extract shots.

62.    After their two close brushes with the law, and a host of wrongful death lawsuits, Defendant Palaio and Mark Reilly (along with a cadre of other unknown associates) moved on from synthetic cannabis and began the OPMS Kratom Enterprise in earnest.

63.    From the outset, however, the OPMS Kratom Enterprise would be conducted differently.  Palaio and Reilly had previously operated under only a handful of LLC's, all of which they were directly connected to through their secretary of state filings.  This invited the prying eyes of the law and made tracing their operations too easy.  They would not make the same mistake in running the OPMS Kratom Enterprise.

**D.    The Kratom Supply Chain and the OPMS Kratom Enterprise**

64.    If Defendant Palaio and Reilly wanted to avoid attention they would need to abuse the corporate form to its fullest extent.  They would atomize their operations by employing separate corporate entities (i.e., the Defendant entities) for each part of the Enterprise, and they would no longer appear on multiple corporate fillings as officers.  They would incorporate Defendants in multiple states, the majority of which would be in Wyoming where "ownership and operation locations" could be obscured from the public record.[32]  Indeed, Wyoming was chosen because it "offers some of the broadest privacy measures for company executives [] who want to remain anonymous."[33]

---

[32] **Ex. A** at 9.

[33] *Id.*

65.     None of the OPMS Kratom Enterprise's day-to-day operations would be conducted in Wyoming, however.  Instead, the OPMS kratom trail runs primarily through four states: California, Georgia, Colorado, and Texas.

66.     We turn now to the path OPMS kratom takes through these states, along the way detailing how Defendants separately operate at discrete stages of the supply chain to obscure the totality of their efforts in furtherance of the OPMS Kratom Enterprise.  Some of the information pertaining to OPMS was revealed by the Tampa Bay Times in a four-part series attached as **Exhibit A**.  The reporters "analyzed internal company documents, import data, court records, business filings and inspection reports to piece together a first-of-its-kind examination of [the OPMS Kratom Enterprise's] mysterious supply chain."[34]

67.      Kratom is grown by farmers in Southeast Asian countries such as Indonesia and Thailand.  After the kratom plant has matured its leaves are harvested, dried, and pulverized into a fine powder.  The powder is then packaged into boxes and loaded onto cargo ships destined for the United States.

68.     The majority of kratom shipments will enter the country through the Ports of Oakland and Los Angeles, where it is stored in warehouses by domestic kratom suppliers.[35]

69.     Defendants contract with these suppliers to store kratom in such warehouses and provision kratom to the OPMS Kratom Enterprise through large monthly shipments.  To hide the fact that this kratom is intended for the production of the OPMS Products, only a few of the shell companies which comprise the OPMS Kratom Enterprise will take part in this stage of the supply chain.  Oftentimes, however, multiple Defendants – appearing to the kratom supplier as completely independent entities – will tag in and out of business dealing with suppliers to further obscure their

---

[34] *Id.*

[35] *Id.* at 15.

activities (e.g., one entity will place an order for kratom from a supplier and then another will tag in and pay the invoice for that order).

70.     For example, in 2021 a lawsuit was brought by a kratom supplier against Defendant LGI Holdings, LLC for violating the terms of a supply agreement.[36]  The supplier alleged that it had agreed to maintain an inventory of at least 800 metric tons of kratom for LGI Holdings (owned and operated by Peyton Palaio) in a warehouse in Los Angeles.[37]  In exchange LGI/Palaio agreed to purchase 275-300 metric tons of kratom each month.[38]  Peyton represented to the supplier that he needed this much kratom because LGI was part of a larger "network of companies" which comprise "the largest kratom business in the United States" and that he "wanted to expand to integrate the supply, import, and distribution segments into [Defendants'] existing network, and eliminate supply chain disruption."[39]

71.     Over 30 shipments of kratom were made under the deal, destined (on paper) for a company called Alphabet Wholesale, located in an apartment complex in Pasadena, Texas. Alphabet Wholesale did not exist in any corporate filings, however.  In reality it was a fictious business name Peyton Palaio used for LGI Holdings, LLC, and the kratom was actually destined for Georgia.

72.      The transactions were further complicated by the fact that invoices for these shipments were not paid by LGI Holdings, rather they were paid by Defendant Jopen, LLC.

73.     At first blush, Defendant Jopen does not appear to have any connection to Peyton Palaio or OPMS kratom.  But why then would it pay for these invoices?  The truth is that Defendant

---

[36] **Exhibit D,** Cleanview Complaint ¶ 1.

[37] *Id.* ¶ 31.

[38] *Id.* ¶ 32.

[39] *Id.* ¶ 2.

Jopen is one of the shell entities Defendants use to hide their dealings and stymie investigations into the OPMS Kratom Enterprise.

74.    Fortunately, a 2021 lawsuit filed by Defendant Jopen itself gives the game away. The lawsuit, filed in San Diego County, was brought against a San Diego kratom supplier for failing to deliver bulk orders of kratom that Jopen had ordered and paid over $600,000 for.[40]  In the complaint, Jopen identifies itself as a Texas corporation "doing business as Innovo Activas and [] American Kratom-D."[41]  As noted above, however, Jopen also does business as A1 Wholesale, Evolutionary Organics, and Party Nuts.  This means that Jopen, LLC operates under at least 5 separate fictious business names for no discernable reason.

75.    Despite this clear attempt to abuse the corporate form and hide its dealings, Jopen's true identity as a shell company of the OPMS Kratom Enterprise's is made clear through invoices it attached to its complaint.  The invoices – one of which is reproduced below – show that Jopen placed orders for kratom but then billed and shipped the orders to its alter-egos, Innovo Activas and American Kratom-D.  The shipping address Innovo Activas and American Kratom-D listed was the very same address that Palaio and Reilly were found packaging OPMS kratom, and where the OPMS kratom trademark was registered: 1880 West Oak Parkway Suite 214, Marietta, Georgia.[42]

---

[40] **Exhibit I,** *Jopen LLC v. Sebastian Guthery, et al.,* No. 37-2021-00013845-CU-BC-CTL, Third Amended Complaint.

[41] *Id.*

[42] **Exhibit J**, *Jopen LLC v. Guthery et al.,* No. 3:21-cv-01233-L-BGS, Kratom Purchase Invoice, Doc. 1-2, at 21-23.



76.     Thus, Jopen, Innovo, and American Kratom-D are nothing more than shell corporations through which act in furtherance of the OPMS Kratom Enterprise to discretely purchase and transport kratom from California to Georgia.

77.     Once in Georgia, other Defendants – acting in furtherance of the OPMS Kratom Enterprise – step in to process, package, and test OPMS kratom before handing the Products off to other Defendants.  Here, Defendant Calibre Manufacturing receives shipments of raw kratom powder at various warehouses scattered around Marietta and Alpharetta, Georgia.[43]  The raw kratom is processed and milled into a fine power.[44]

78.     The processed kratom powder is then split into two groups: one group will be left as raw kratom and sterilized and packaged into OPMS Silver capsules and pouches, while the other will go through the extraction process at a high-tech lab.  Neither of these steps will occur in Georgia, however.  So the raw kratom powder is prepared for shipping to the next entities in the

---

[43] **Ex. B.**
[44] **Ex. A** at 21.

OPMS Kratom Enterprise supply chain.  Defendant Nuza Logistics steps in at this point, handling shipping out of the raw kratom out of Georgia.[45]

79.    Kratom which was to be packaged into the OPMS Silver capsules and pouches is shipped off to Texas where it is sterilized and then returned to Georgia.[46]  The remainder makes its way to Defendant LP Ind. (d/b/a Jordan Process) in Springfield, Colorado.

80.    As the Tampa Bay Times reporting notes:

> Jordan Process is a remote Colorado factory that has processed [OPMS] kratom into extracts.  Property records show a company that listed [Defendant] Palaio as president purchased the land where it is built in 2016.  Ownership is now in the hands of a company managed by his grandfather, who died earlier this year.  Workers say they've seen Palaio at the factory and said the facility was named after his brother Samuel Jordan Palaio.  An internal organization chart from 2021 for Jordan Process lists "PP" as CEO.[47]

81.    Jordan Process operates under parent company Olistica Life Sciences Group (although Olistica is itself a fictious business entity under Defendant LP Ind., LLC).  As noted above, Olistica is the company Defendant Palaio described as part of his "operation."  Indeed, until earlier this year a LinkedIn page said Palaio was the former chief executive officer of Olistica.[48]  Olistica and its subsidiaries are Defendants' outward facing attempt to vertically integrate the OPMS Kratom Enterprise supply chain.[49]

82.    As a way to hide the OPMS Kratom enterprise, Olistica advertises itself vaguely as a "fully integrated technology company focused on the research and development, manufacturing, and distribution of natural therapeutics and high-quality plant-based derivatives."[50]

---

[45] **Ex. B.**

[46] **Ex. A** at 21.

[47] **Ex. B.**

[48] *Id.*

[49] *See* **Ex. E,** Olistica Slide Deck.

[50] https://www.olistica-group.com/#about-olistica

83.    To further hide their operations, Defendants also run a CBD business through the Olistica entities.  Defendants went so far as to hide what workers at Jordan Process were making from them: "[g]reen bricks of kratom powder arrived at [Jordan Process] by the truckload.  Yet no one in management…talked about what the substance was…Supervisors typically referred to it as 'product B' or 'flour.'"[51]

84.    After having been refined into extract powder at Jordan Process in Colorado, the OPMS kratom extract powder is then shuttled back to Georgia where Defendant Calibre Manufacturing packages a portion of it into OPMS Black and Gold Capsules.[52]  The other portion of the extract powder is turned into the liquid OPMS Black and Gold extract shots.  This is also where the raw kratom powder which was sent to Texas for sterilization is packaged into OPMS Silver pouches and capsules.[53]

85.    The OPMS Products are now ready for final packaging and distribution.  This does not occur in Georgia, however.  It occurs in Dallas, Texas.

86.     The entity in charge of placing the OPMS Products in their official packaging is A1 Wholesale (aka Defendant Jopen, LLC/LP Ind., LLC).[54]  A1 Wholesale acts as a wholesaler of various products, including CBD.  However, OPMS kratom is its "bread and butter."[55]  In interviews, A1 Wholesale employees a describe how "capsules and raw powder were loaded into O.P.M.S. package sleeves inside a vast industrial building" and "liquid extracts were bottled into

---

[51] **Exhibit A** at 22**.**

[52] *Id.* at 29.

[53] *Id.*

[54] *Id.* at 31.

[55] *Id.*

petite shots."[56]  This fact is independently corroborated by a job review posted by a disgruntled employee on GlassDoor.com.



87.    After packaging, employees at another location in Dallas owned by Defendant Jopen fulfill online orders through Jopen's alter-ego PartyNuts.

88.    PartyNuts acts as the master distributor for the OPMS Kratom Enterprise, through which all other wholesalers and distributors, across the United States including in New York, must first order OPMS Kratom Products.

89.    Accordingly, PartyNuts knowingly and intentionally sells and ships OPMS Kratom to buyers across the country, including in New York.

90.    As described above, PartyNuts is registered as a fictitious entity under Defendant Jopen, LLC, which also runs A1 Wholesale.

91.    Jopen, LLC is merely a shell corporation acting in concert with the other Defendants at the behest of Defendant Peyton Palaio, Mark Reilly, and other unknown individuals in furtherance of the OPMS Kratom Enterprise.

---

[56] *Id.*

92.     Thus, Defendants are, together, involved in every step of the OPMS kratom supply chain, from import to distribution.  They act in tandem as conduits through which the OPMS Kratom Enterprise is run.  Martian Sales Inc., by and through Mark Reilly, is part of this web.  Together, these entities act as a single enterprise and purposely direct their activities at New York and every other State in the nation.  Below is a portion of an infographic (attached hereto as **Exhibit K**) created by the Tampa Bay Times to illustrate OPMS kratom's peregrinations across the country.



93.     For years, Defendants have used their shell companies and deliberately convoluted business practices to hide their dealings and elude accountability for their actions.  No longer.

**E.    Defendants Knew or Should Have Known They Were Selling a Highly Addictive Drug to Unsuspecting Consumers**

94.    Despite As detailed above, Defendants operate under the brand name O.P.M.S. (short for Optimized Plant Mediated Solutions).  The OPMS Kratom Enterprise is the largest importer, producer, and seller of kratom products in the United States.

95.    Notably, Defendants specialize in kratom extracts.  As Defendants' website used to note: "O.P.M.S. has been an industry-leading supplier of Kratom extract for more than 5 years. By utilizing O.P.M.S.'s patented extraction process, they have set a new quality, an unrivaled standard in the botanicals market."

96.    Kratom extracts are a concentrated form of kratom, whereby the active kratom alkaloids (MG and 7-OH included) are distilled from the leaf powder and sold in powder or liquid preparations.

97.    The purpose of kratom extracts is to create a vastly more potent product as there is a greater concentration of MG and 7-OH, and all other alkaloids, by weight compared to regular powder kratom.  For example, a single O.P.M.S. Gold Extract capsule, which contains 200mg of kratom extract, has MG and 7-OH in doses equivalent to 4-7 grams of kratom powder.

98.    The liquid extracts are even more potent, with one 8.8ml "shot" of O.P.M.S. Gold Liquid Extract having MG and 7-OH in doses equivalent to 10-15 grams of powder and one "shot" of O.P.M.S. Black Liquid Extract being the equivalent of well over 15 grams of powder.

99.    Defendants' "Black" line of extracts go even further, with 7-OH concentrations 35 times greater than their "Gold" extracts and regular kratom leaf powder.  As discussed above, 7-OH is 17 times more potent on the mu-opioid receptor than morphine.  Thus, the 7mg of 7-OH in a single O.P.M.S. Black Extract capsule is equivalent to roughly 119mg of morphine.

100.    Indeed, Defendants' brand name appears to be a tongue in cheek nod to the power of its extracts: the "OPM" in "O.P.M.S." sounds like "opium" when said aloud.  Indeed Palaio is no stranger to opioids, having been arrested for possession of heroin in 2009.

101.    Consumers who take Defendants' extracts are exposed to significantly elevated levels of MG and 7-OH compared with those who take regular kratom.  This produces greater euphoria and "feel good" effects at first, but only leads to deeper addiction down the road.

102.    No matter what Product consumers take, they are exposed to highly concentrated forms of kratom without knowing just how addictive the extracts, in particular, can be.

103.    As described above, Defendants have accomplished such refinement in their kratom Products because Defendants operate Olistica Life Sciences Group ("Olistica").

104.    Defendant Olistica's stated mission is to "boost" the chemical effects of botanical and organic compounds and legal highs: "Olistica's manufacturing partner [Jordan Process] is a full-service producer and manufacturer of novel materials and botanical APIs specializing in cannabis **as well as both classic and novel plant species** with therapeutic applications. ... Our partner works with global suppliers and agricultural partners to commoditize and **<u>enrich the derivatives of natural products</u>**."[57]

105.    No surprise then, that Defendants hold themselves out as experts in kratom's pharmacology, stating: "O.P.M.S. characterized all apparent alkaloids of the *Mitragyna Speciosa* plant and then determined the most optimal conditions to safely and effectively remove each individual component," and that "during the most common processes used by our competitors, some significant alkaloids are flushed out in the process, leading to inferior products."

---

[57] https://www.olisticagroup.com/facilities

106. Defendants have interacted with growers and distributors in Southeast Asia who have disclosed the addictive nature of kratom to them. Indeed, Defendants, through Defendant CAG Holdings CO, LLC (d/b/a Companion Ag), may very well own or operate kratom farms in Southeast Asia.

107. Even without such interactions, Defendants have received numerous user reports about the addictive potential of kratom in the United States.

108. If Defendants have been able to characterize each of the kratom plant's alkaloids and understand which of them are "significant" then Defendants are aware of the interaction between MG and 7-OH (the two primary alkaloids in kratom) and the mu-opioid receptor.

109. Defendants therefore knew or should have known that the Products they were selling were highly addictive.

110. Despite this knowledge, Defendants have failed to disclose the addictive potential of kratom on their website or on their Products' packaging.

111. The furthest that Defendants went in "disclosing" the addictive nature of kratom was a single sentence buried in the "DISCLAIMER" page on their website, which stated: "[s]ome publications have suggested kratom may be associated with serious potential side effects, including seizures, liver damage, withdrawal, addiction, abuse, and death." This is deliberately misleading, and further no such disclaimer is made on the Product packaging in stores, where consumers are most likely to encounter Defendants' statements. What's more, Defendants' website was taken down sometime in 2024.

112. The pharmacological effects of MG and 7-OH have been thoroughly studied, and it is well-established that MG and 7-OH act on the same mu-opioid receptors in the brain as traditional opioids. Further, there are widespread user reports and case studies of addiction and dependency issues.

113.    To reiterate, this is not an instance where the science is still up for debate.  It has been known for decades in the English-speaking world that kratom is highly addictive and has the potential to cause physical and psychological dependence in regular users.  It has been known for over a century in Southeast Asia that kratom is addictive.

114.    Consumers, however, did not have access to this knowledge for years, and to this day misinformation about kratom is rampant.

115.    Defendants, on the other hand, definitively know that kratom users can develop an addiction.  Yet, up until February 2023, Defendant made no efforts to warn consumers about the potential risks of taking their Products.  Then, in November 2023 Defendants' website, opmkratom.com, was plastered with warnings.  This, of course, was too little too late for consumers who visited Defendants' website before this change.

116.    Defendants' Products' packaging, in particular, is woefully sparse. A representative image of Defendants' Products is depicted below:




117.    On the back of each Product's packaging is a bog-standard disclaimer stating that users take responsibility for any adverse events or health complications.

118.    Defendant's kratom extract bottle labeling is substantially the same, with minimal disclosures or warnings and barely legible text:

 

119.    There is no warning to consumers that the Product interacts with opioid receptors, nor is there any warning that the product is highly addictive and that it should not be taken on a daily basis.

120.    Further, the packaging itself is innocuous.  The OPMS logo includes a pleasant-looking green leaf, a filigree is printed on either side of the word "gold" and in each corner of the package is a segment of what looks to be an ornamental frame.  The extract bottle is reminiscent of a "5-Hour Energy" brand bottle.  Nothing about this packaging would lead reasonable consumers to believe they were purchasing compounds similar to opioids, that function on the same mu-opioid receptors in the brain.

121.    Reasonable consumers looking at the Products' packaging would not presume that kratom is highly addictive.

122.    At the time the first complaint was filed, Defendants' website was sparse as well, with most of the text on each page dedicated to extolling their "high pressure/cold water extraction

process that preserves the natural integrity of the plant's alkaloids." The only representations that Defendants made about the properties of their Products is that they are "all-natural" and "the pinnacle of all kratom products."

123. The only outlier was Defendants' "Black" line of kratom Products, which contains the highest doses of MG and 7-OH. On each of those product pages Defendants stated that the Product "will quickly become a favorite among our customers." Perhaps this is because consumers are unwittingly ingesting 7-OH at levels high enough to mimic the effects of a sizable dose of morphine.

124. Nowhere did Defendants mention that kratom presents the same addiction problems that former opioid users and other consumers would want to avoid. Those seeking help as they come off opioids may be drawn in by Defendants' statements about kratom without knowing that they risk trading one addiction for another.

125. The consequences of kratom addiction are not mild: "in humans, opioid-like withdrawal symptoms have been reported following cessation of kratom use," though "the withdrawal syndrome appears to be less severe than withdrawal from morphine."

126. While kratom withdrawal may be "less severe" than morphine withdrawal, that is hardly a seal of approval – morphine withdrawal is one of the most unpleasant experiences that one can endure in modern life. And kratom withdrawal, while perhaps "less severe" than morphine withdrawal, is still an "opioid-like withdrawal" (according to the World Health Organization), with the same physical and mental symptoms. And kratom is unquestionably addictive and habit-forming.

127. The risk of "opioid-like withdrawal symptoms" is a material fact to reasonable consumers because addiction is a disease and poses an unreasonable health hazard.

128.    What's more, kratom extracts are significantly more potent and addictive than regular raw kratom powder.

129.    As a kratom product manufacturer and distributor, Defendants occupied a position of superior knowledge to the average reasonable consumer, who likely knows next to nothing about kratom.

130.    Defendants, through their misleading advertising and their failure to disclose kratom's addictive properties on their Products' labels, relied upon the average consumer's incomplete knowledge of kratom to sell their Products and get users addicted to kratom.

131.    Defendants fail to disclose kratom's addictive potential because Defendants knows that it is a material fact to reasonable consumers which would influence their purchasing and consumption decisions, likely to Defendants' detriment.

132.    By any metric, Defendants' conduct is immoral, unethical, and contrary to New York public policy.

133.    The United States is going through an opiate crisis that is shaking the foundations of our society.  Amid this crisis, Defendants are creating more addicts for no reason other than to line their pockets, without adequate disclosures of their products' risks and through the use of false and misleading packaging.  That cannot – and should not – be allowed, at least when their conduct entails breaches of warranty and violation of state consumer protection statutes (as it does here).

**F.    Defendants Do Business in the State of New York**

134.    As described above, Defendants, through PartyNuts, act as master distributors of their Products.  Thus, Defendants engage in substantial business activities in New York.

135.    What's more, even on Defendants' own website, Defendants provides a store locator map.  A customer can see the stores closest to their location and each innocuous green leaf logo symbolizes a store selling Defendants' Products.  In Long Island alone, there are too

many stores to count because the map below the logos can barely be seen from the quantity of stores that Defendants refers customers to as selling their Products.





136.    Customers can even enter their zip code and be directed to the addresses of stores which it knows is selling their Products, as seen below for a New York zip code.



**Plaintiff J.P.'s Experience**

137.    Plaintiff J.P. first heard about kratom through the owner of his local corner store, who did not mention the risks of dependency or addiction, and indeed insisted that kratom was not addictive.  J.P. was recovering from surgeries and sports injuries and was told Defendants' Products were "natural" alternatives to opiates.  As such, J.P. did not know that kratom was addictive and had no reason to know.  He began purchasing O.P.M.S. branded kratom capsules and powder in 2017 from retail stores in the Brooklyn, New York area.  When J.P. made his first purchase, he reviewed the O.P.M.S. packaging and labels, but there were no disclosures on the package that would have corrected his misunderstanding about the Product's addictive potential.

Because there were no disclosures, J.P. thought that O.P.M.S. kratom could be consumed every day without the risk of physical dependence.  J.P. started with OPMS Gold Shots and then moved to OPMS Gold Extract Capsules.

138.    J.P. later discovered that O.P.M.S. kratom was, in fact, addictive.  Within 24 hours of J.P.'s attempt to cease using kratom, he was wracked by intense physical and psychological withdrawal symptoms that were substantially similar to traditional opiate withdrawals – with symptoms including flu symptoms, severe restless legs, body aches, and vomiting.  J.P. realized he was addicted to kratom in May 2022 and felt that he was being held captive by the specter of withdrawal.  Though J.P. wanted to stop, he could not.

139.    J.P. is still addicted to O.P.M.S. kratom but wants to stop using.  Had J.P. known that kratom was so addictive, and that cessation would be so difficult, he would never have purchased the Products.  J.P. estimates that he has been taking five (5) OPMS Gold Extract Capsules every day for the last four years - $45 a day, every day. J.P. made his purchases in and around Brooklyn, New York.

## CLASS ALLEGATIONS

140.    *Class Definition*.  Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of himself and all other similarly situated consumers, and seek to represent a class (the "**Class**") defined as:

> All persons in New York who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, purchased O.P.M.S. kratom products.

141.    Specifically excluded from the Class are Defendants and any entities in which Defendants have a controlling interest, Defendants' agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

142.    Plaintiff reserves the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

143.    ***Numerosity***.  Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, the Class comprises at least thousands of consumers throughout New York.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants.

144.    ***Commonality and Predominance***.  Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

  a.    whether the labels on Defendants' Products have the capacity to mislead reasonable consumers;

  b.    whether Defendants knew that kratom is a highly addictive substance;

  c.    whether Defendants' conduct alleged herein violated New York's General Business Law §§ 349-350, *et seq*.;

  d.    whether Defendants' conduct alleged herein constitutes unjust enrichment;

  e.    whether Defendants' conduct constitutes negligent omission;

  f.    whether Plaintiff and the Class are entitled to damages and/or restitution; and

  g.    whether Plaintiff and the Class are entitled to attorneys' fees and costs.

145.    ***Typicality.***  The claims of Plaintiff are typical of the claims of the Class in that Plaintiff and the Class sustained damages as a result of Defendants' uniform wrongful conduct, based upon Defendants' failure to inform Plaintiff and all others similarly situated that their Products are highly addictive and akin to opioids.

146.    ***Adequacy.***  Plaintiff will fairly and adequately protect Class members' interests. Plaintiff has no interests antagonistic to Class members' interests, and Plaintiff has retained

counsel that have considerable experience and success in prosecuting complex class-actions and
consumer-protection cases.

147.    *Superiority.*    A class action is superior to all other available methods for the fair
and efficient adjudication of this controversy for, inter alia, the following reasons: prosecutions of
individual actions are economically impractical for members of the Class; the Class is readily
definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs,
conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action
permits claims to be handled in an orderly and expeditious manner.

148.    Defendants have acted or failed to act on grounds generally applicable to the Class,
thereby making appropriate final injunctive relief with respect to the Class as a whole.

149.    Without a class action, Defendants will continue a course of action that will result
in further damages to Plaintiff and members of the Class and will likely retain the benefits of their
wrongdoing.

150.    Based on the foregoing allegations, Plaintiff's claims for relief include those set
forth below.

### COUNT I
### Violation of New York  General Business Law § 349 ("GBL"),
### (On Behalf of Plaintiff and Class Members)

151.    Plaintiff realleges and incorporates by reference every allegation set forth in the
preceding paragraphs as though alleged in this Count.

152.    Plaintiff brings this claim individually and on behalf of the members of the
proposed Class against Defendants.

153.    This claim is brought pursuant to the laws of the State of New York.

154.    New York General Business Law Section 349 ("GBL § 349") declares unlawful
"[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the

furnishing of any service in this state."

155.    Defendants committed deceptive acts and practices by employing false, misleading, and deceptive representations and/or omissions about the addictive properties of their Products and the serious risk of addiction.

156.    Information as to the potential addiction risks of their Products was in Defendants' exclusive control.  Plaintiff could not possibly have known that the Products at issue would pose a serious risk of addiction because such information was not available to the public.

157.    Defendants' deceptive acts and practices were directed at consumers.

158.    Defendants' deceptive acts and practices are misleading in a material way because they violate consumers' reasonable expectations.  Defendants knew consumers would purchase their Products and/or pay more for them under the false – but reasonable – belief that they were safe to consume regularly and did not pose a serious risk of addiction.

159.    Defendants knows that health information about their Product is material to consumers.  If such information were not material, Defendants would not market their Products as "all natural."  As a result of their deceptive acts and practices, Defendants sold tens if not hundreds of thousands of kratom Products to unsuspecting consumers across New York.

160.    If Defendants had advertised their Products truthfully and in a non-misleading fashion, Plaintiff and other Class Members would not have purchased them or would not have paid as much as they did for them.

161.    As a direct and proximate result of Defendants' false, misleading, and deceptive representations and/or omissions, Plaintiff and other Members of the Class were injured in that they would not have purchased the Products, or would have paid substantially less for them, but for Defendants' misrepresentations and omissions concerning the addictive properties of their kratom Products.

162.    On behalf of themselves and Members of the Class, Plaintiff seeks to recover his actual damages, statutory damages of $50 per unit sold in the state, three times actual damages, and reasonable attorneys' fees.

## COUNT II
### Violation of New York GBL § 350,
### (On Behalf of Plaintiff and the Class Members)

163.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

164.    Plaintiff brings this claim individually and on behalf of the Class against Defendants.

165.    This claim is brought pursuant to the laws of the State of New York.

166.    New York General Business Law Section 350 provides, in part, as follows: False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

167.    New York General Business Law Section 350-A(1) provides, in part as follows: "The term 'false advertising,' means advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.  In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representation made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual."

168.    Defendants' labeling and advertisements contain untrue and materially misleading statements concerning Defendants' Products inasmuch as they misrepresent and fail to disclose the existence of serious potential for addiction in their Products.  By misrepresenting the true

contents of the Products, Defendants' marketing and labeling misleads a reasonable consumer.

169.    Defendants had exclusive knowledge of the addictive nature of their Products.

170.    Defendants' misrepresentations and omissions were material because consumers are concerned with the safety of the Products they purchase, and the nature of the ingredients therein.

171.    As a result of Defendants' misrepresentations and omissions, Plaintiff and members of the Class have suffered economic injury because they would not have purchased the Products, or would have paid substantially less for them, if they had known that the Products posed a serious risk for addiction.

172.    Defendants' material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing the Products were and continue to be exposed to Defendants' material misrepresentations.

173.    As a result of Defendants' recurring, unlawful deceptive acts and practices, Plaintiff and the Class Members are entitled to monetary, statutory damages of $500 per unit sold, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

## COUNT III
### Unjust Enrichment

174.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

175.    Plaintiff brings this claim individually and on behalf of the Class against Defendants under the laws of the State of New York.

176.    Plaintiff and the members of the Class conferred a benefit on Defendants in the form of the gross revenues Defendants derived from the money they paid to Defendants.

177.    Defendants had an appreciation or knowledge of the benefit conferred on it by Plaintiff and the members of the Class.

178.    Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff and the Class members' purchases of the Products, which retention of such revenues under these circumstances is unjust and inequitable because Defendants omitted that the Products were addictive and similar to opioids.  This caused injuries to Plaintiff and members of the Class because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known.

179.    Defendants accepted and retained the benefit in the amount of the gross revenues it derived from sales of the Products to Plaintiff and the members of the Class.

180.    Defendants have thereby profited by retaining the benefit under circumstances which would make it unjust for Defendants to retain the benefit.

181.    Plaintiff and the members of the Class are, therefore, entitled to restitution in the form of the revenues derived from Defendants' sale of the Products.

182.    As a direct and proximate result of Defendants' actions, Plaintiff and the members of the Class have suffered in an amount to be proven at trial.

183.    Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from his purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which he is are entitled.

184.    Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price will ensure that Plaintiff is in the same place he would have been in had Defendants' wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at his disposal.

## COUNT IV
### Fraud by Omission

185.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

186.    Plaintiff brings this claim individually and on behalf of the Class against Defendants under the laws of the State of New York.

187.    Defendants distributed their Products throughout the State of New York.

188.    Defendants misrepresented that their kratom Products have attributes or qualities that they do not have by failing to disclose that kratom is addictive and can cause opioid-like withdrawal.

189.    Defendants knows that kratom is addictive because it interacts with kratom vendors, has been made aware of user reports, and has fully characterized kratom's alkaloids and created advanced extraction methods.

190.    Defendants knows that knowledge of kratom's addictive nature is a material fact that would influence the purchasing decision of reasonable consumers.

191.    The average reasonable consumer in the kratom purchasing context does not know that kratom is addictive and cannot reasonably access that information.

192.    Defendants therefore had a duty to Plaintiff and the members of the Class to disclose that kratom is addictive and can cause withdrawals on the Products' packaging.

193.    Consumers reasonably and justifiably relied on Defendants' omission because it is reasonable to assume that a product which is addictive like an opioid would bear some kind of a warning.

194.    As a result of Defendants' omission, Plaintiff and the members of the Class paid for kratom Products they may not have purchased, or paid more for those Products than they would have had they known the truth about kratom.

## <u>COUNT V</u>
## Negligent Misrepresentation

195.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

196.    Plaintiff brings this claim individually and on behalf of the Class against Defendants under the laws of the State of New York.

197.    Defendants distributed their Products throughout the state of New York.

198.    Defendants misrepresented that their kratom Products have attributes or qualities that they do not have by failing to disclose that kratom is addictive and can cause opioid-like withdrawal.

199.    Defendants knew or should have known that kratom is addictive because it interacts with kratom vendors and has been made aware of user reports and scientific studies.

200.    Defendants knew or should have known that knowledge of kratom's addictive nature is a material fact that would influence the purchasing decision of reasonable consumers.

201.    The average reasonable consumer in the kratom purchasing context does not know that kratom is addictive and cannot reasonably access that information.

202.    Defendants therefore had a duty to Plaintiff and the members of the Class to disclose that kratom is addictive and can cause withdrawals on the Products' packaging.

203.    Consumers reasonably and justifiably relied on Defendants' omission because it is reasonable to assume that a product which is addictive like an opioid would bear some kind of a warning.

204.    As a result of Defendants' omission, Plaintiff and the members of the Class paid for kratom Products they may not have purchased, or paid more for those Products than they would have had they known the truth about kratom.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff J.P., individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

a.  For an order certifying the Class and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

b.  For an order declaring Defendants' conduct violates the statutes referenced herein;

c.  For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

d.  For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e.  For prejudgment interest on all amounts awarded;

f.  For an order of restitution and all other forms of equitable monetary relief;

g.  For injunctive relief as pleaded or as the Court may deem proper; and

h.  For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: February 10, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: ___*/s/ Neal J. Deckant*___
        Neal J. Deckant

Neal J. Deckant
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email:  ndeckant@bursor.com

*Attorneys for Plaintiff*